UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 00-158 (JRT)
Civil No. 05-639 (JRT)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S RESPONSE |
| | ) | TO PETITION PURSUANT TO |
| v. | ) | SECTION 2255 |
| | ) | |
| JAMES LAMONT CHAPMAN, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys Thomas B. Heffelfinger, United States Attorney for the District of Minnesota, and Lisa A. Biersay, Assistant United States Attorney, hereby submits it response to the petition pursuant to section 2255.

**STATEMENT OF THE FACTS**

**A. The Investigation**

Craig Chapman, his brother and co-defendant James Chapman, Francisco Barron, and Arturo conspired with each other to distribute more than 60 kilograms of marijuana. On May 11 and 12, 2000, Craig Chapman had repeated contacts with Francisco Barron - deployed by marijuana supplier, Arturo - to arrange exchanging more than $30,000 for marijuana. On May 12, 2000, Craig Chapman obtained some of the money from James Chapman and immediately met with Barron for the exchange. Craig Chapman was arrested at the exchange site. Later, at Craig Chapman's home, officers recovered three containers with marijuana residue and approximately 1.8 pounds of marijuana, as well as marijuana distribution materials.

The investigation in this case began with a routine traffic stop in Colorado. On May 9, 2000, Trooper Ortiz stopped Barron and became suspicious that he was transporting marijuana. (Tr. 264-268.) Barron consented to a search of his Cadillac. In the trunk, Trooper Ortiz recovered thirty bundles of marijuana dispersed between four duffel bags. (Tr. 269-271.) He arrested Barron. The packaged marijuana weighed approximately 190 pounds. The case, evidence, and custody of Barron were turned over to the Colorado Drug Enforcement Administration (DEA). (Tr. 272, 282.)

Barron decided to cooperate with the Colorado DEA. He told DEA agents that this was not his first trip transporting marijuana to Minnesota. (Tr. 301-310.) He had been transporting marijuana from Arizona to Minnesota for an individual known as "Arturo." (Id.) Once in Minnesota, he would rent a hotel room, preferably a Super 8 Motel in the Burnsville, Minnesota area, telephone Arturo's Minnesota marijuana buyer, and arrange an exchange of marijuana for cash.[1] (Gov. Ex. 35.) Arturo would pay Barron with a portion of the cash. Barron explained that this trip was to follow a similar pattern. He agreed to assist investigators by participating in a controlled delivery to the Minnesota buyer.

---

[1] Subpoenaed records showed that Barron previously had stayed at the Burnsville Super 8 Motel on November 14, 1999; February 24, 2000; and May 2000. (Tr. 303; Gov. Ex. 134.) He stayed at the Burnsville Red Roof Inn on April 6, 2000. (Tr. 304; Gov. Ex. 135.)

DEA Task Force Officer Perry Powell and DEA Special Agent Bill Eldridge, both from Colorado, accompanied Barron and some of the marijuana to Minnesota. (Tr. 298; Sent. 31-32.) Investigators placed Barron in a monitored Super 8 Motel room in Burnsville, Minnesota. (Tr. 323-325.) To replicate Barron's Cadillac, still in Colorado, investigators obtained another Cadillac and added the license plate taken from Barron's Cadillac. They placed four marijuana bundles in a duffle bag and into the trunk of the replacement Cadillac. (Gov. Exs. 31-34.) The marijuana and the duffle bag were items taken by Trooper Ortiz during the traffic stop.

To set up surveillance, investigators relied on two business cards retrieved from Barron's wallet to initiate the Minnesota component of the investigation. (Gov. Exs. 36 and 37.) Both business cards contained names, business information, addresses, and telephone numbers that led directly to Craig and James Chapman. (Gov. Exs. 36, 37, 133.) Surveillance was placed at Craig Chapman's home, 3330 Girard Avenue, and, later, at James Chapman's place of residence, 3631 Lyndale Avenue.

Back at the Super 8 Motel, Barron made telephone calls to Craig Chapman. These calls were supervised and recorded by DEA Special Agent Tammie Key. On May 11, 2000, two days after the Colorado traffic stop, Barron finally spoke to Craig Chapman by phone. (Gov. Ex. 38A.) Craig Chapman told Barron that Arturo had

been calling to find Barron. Barron relayed Arturo's concerns about the marijuana payment. Craig Chapman assured Barron that he and James had gathered the money:

Chapman: **Call your people too, man. They called yesterday and today.**
Barron: Oh, they called.
Chapman: **4 or 5 times.**
Barron: Oh, **Arturo** call?
Chapman: Yep. . . .
Barron: Hey, **Arturo** asked, told me to ask you but ah, you have the whole thing on the money?
Chapman: Ah, I believe so. **I'll check with James.**
Barron: Oh you checked, ok.
Chapman: Yeah, if not **we're so close it don't make no difference.**
Barron: So, ah, help me out with this thing, then just get the car and bring me out and bring it tomorrow, I got the keys here in my room. . .
Barron: Ah ha, Yes, Barron, and it's room 115. **Hey ah, what'd Arturo say**?
Chapman: **Nothing**
Barron: **He was worried**?
Chapman: **Yeah, worried.**
Barron: Oh, shit.
Chapman: **Just tryin' to see where you were, said you would be here tonight or tomorrow.**

(Id. (emphasis added).) The next day, Barron and Craig Chapman again spoke about meeting for the exchange. Again, Craig Chapman said he had to contact his brother before the meeting.

Barron: Uh huh. Hey, ah, what you gonna do? Why don't you come and get this shit and
Chapman: **Yeah, let me call my bro.**
Barron: And relieve me of my misery.
Chapman: Yeah. Let me give him a call so that I can get a way out there.
Barron: . . . Let's take advantage of time man.
Chapman: **Alright, let me get him, get in touch with him.**

(Gov. Ex. 39A (emphasis added).)

Later that day, the surveillance team followed Craig Chapman to James Chapman's place of residence at 3631 Lyndale Avenue. Craig Chapman, empty-handed, went into 3631 Lyndale Avenue. He left shortly thereafter. With an air-pump box. (Gov. Ex. 45; Nelson 6-10.) Craig Chapman drove to the Super 8 Motel where he went to Barron's hotel room; the encounter was videotaped. (Gov. Ex. 41.)

In the hotel room, the men once again discussed Arturo. (Gov. Ex. 41A.) Craig Chapman anticipated that Barron would be driving a Cadillac:

Chapman: **What were you driving? Cadillac**?
Barron: Classy one.
Chapman: That's nice.
Barron: Yeah, it's nice, you want to try it?
Chapman: Naw.
Barron: Oh. OK. Let me turn this off.

(Gov. Ex. 41A.) The men left the hotel room. Craig Chapman accompanied Barron to the Cadillac. (Tr. 463.) Both men were arrested. The air-pump box was seized. It contained a substantial amount of cash. (Gov. Ex. 45A.1; Tr. 598.) In the air-pump box and a plastic bag, officers recovered over $30,000, combined, in cash. Deputy Nelson then obtained search warrants for 3330 Girard Avenue and 3631 Lyndale Avenue.

At 3330 Girard Avenue, Craig Chapman's home, officers recovered telephone numbers for Arturo and Barron. (Gov. Exs. 47, 48; Nelson 100-101.) Deputy Nelson found a blue Coleman cooler that had marijuana residue. (Gov. Ex. 53; Nelson 34.) In Craig

Chapman's bedroom, Deputy Nelson recovered a green file box (Gov. Ex. 54) with approximately 1.8 pounds of marijuana, an ounce scale, an empty "baggie" box, and a plastic bag with marijuana "shake." (Gov. Exs. 55, 56, 57, 58A.1, 58A.2; Nelson 34-35.) From that room, he also seized $1,300 in cash, more than $1,000 of it from Craig Chapman's jacket pocket. (Nelson 36-37.)

Deputy Nelson took two representative samples of the suspected marijuana (Gov. Exs. 55A and 56A), found in the file box, for chemical analysis. (Nelson 41.) Both samples tested positive for marijuana. (Carlson 13.)

In the garage at 3631 Lyndale Avenue - James Chapman's then residence - Officer Wood recovered a blue Rubbermaid cooler. James Chapman had safeguarded his marijuana and marijuana-distribution materials in that blue Rubbermaid cooler, locked in a garage controlled by him, guarded by his trained pit bull terrier, and tainted with his own fingerprints. (Gov. Exs. 63A.1, 63A.2; Kritzech 8-10,15, 16, 22; Tr. 429, 587, 588-89, 591, 602-604.) The cooler contained numerous marijuana baggies - two of which had James Chapman's fingerprints. (Gov. Exs. 79 and 80; Tr. 426-27, 437.)

**B. <u>Defendants' Accusations of Government Misconduct</u>**

Defendant James Chapman, his brother Craig Chapman, and Barron contemporaneously were charged by complaint and, later, by indictment, for participating in a drug conspiracy with each other

and others. The government moved for Barron's detention. When the magistrate judge denied the government's motion for Barron's detention, he fled. (Tr. 22-24.) Barron was a fugitive at the time of trial. He remains a fugitive.

James Chapman was charged in a two-count second superseding indictment on April 18, 2001. He was charged in Count 1 with conspiring with Craig Chapman, Francisco Barron, and others to distribute marijuana between March 2000 and on or about May 12, 2000, in violation of Title 21, United States Code, Section 846. James Chapman also was charged in Count 2 with possessing with intent to distribute marijuana, on or about May 12, 2000, in violation of Title 21, United States Code, Section 841(a).

Beginning with pre-trial motions and hearings, and continuing through trial, and post-trial submissions and arguments, the defendants claimed government misconduct and an improperly motivated, biased investigation. Specifically, they claimed the government hid crucial witnesses and planted and manipulated evidence. For example, during the February 7, 2001 motion hearing, defense counsel accused the government of procuring Barron's absence:

> [T]his whole incident smells, your Honor. We have someone [Barron] who should have been held, now has been released. The Government through its consulates and through its embassies may have the ability to contact this individual and talk to him, but we as defendants, we have no ability to do that, none whatsoever. . . [We have submitted a] motion to dismiss based upon the outrageous

> Government conduct, and that stems from the INS code and the fact Mr. Barron was let go[.]

(Mot. Hr'g Tr. at 20-21.) Additionally, during trial, the defendants claimed that Barron was working as an informant at the time of his Colorado arrest and had been so employed for thirty years; that the government repeatedly had dismissed egregious charges against Barron in exchange for his work as an informant; and that the government again had rewarded Barron by allowing him to flee. (Tr. 19-25.) For example, defense counsel for Craig Chapman claimed his defense investigator had uncovered evidence of misconduct on the behalf of government agents and prosecutors:

> [Defense Counsel] Mr. Smith: . . . I'm a bit troubled at this time Your Honor, because the allegations that I'm making are serious. And could lead to further charges in the future against the attorneys involved for the government. . . . [My investigator] found that Mr. Barron has been involved with the government for over 30 years. And that is why all these charges have been dismissed. You have the ability to be a resident alien [Barron], even though you've been involved in criminal activity of transporting marijuana, trafficking marijuana, concealing marijuana, being in control of a controlled substance . . . This gentleman was able to shoot at an officer and get the charges dismissed.
>
> Now, there are individuals within the government who have provided us with this information. But due to the fact that they fear retaliation, and they fear for their jobs, they are not willing to come forth . . .
>
> This Court's integrity depends on the government coming forth as the prosecution not only thinking about winning, but thinking about putting forth justice. But if the government is going to come here and deceive this Court . . . we have a serious problem your honor.

(Tr. 16-19.) The court repeatedly asked the defense to explain the relevance of the allegations. (Tr. 36.) The investigator never testified. Instead, the investigator's attorney appeared on his behalf and indicated to the district court that the investigator had no pertinent testimony. (Tr. 489-90, 658-68, 724-734.) This court addressed the issue of Barron's release and alleged informant status:

> Here's the problem. I don't think at this point the Court can deal any longer with what truly is nothing more than speculation. The fact remains that the Court is unaware at this point of any information, admissible or not, that Barron was a government informant past 1973. The Court has already ruled that the informant status back in 1973 does not in any way affect this case, or the fact that he is an alleged co-conspirator in this case. . . . And on the record I have seen, I find no basis to conclude that the United States somehow made sure that Mr. Barron was not available.

(Tr. 667, 730.)

In opening statement, defense counsel heralded to the jury the theme of government bias in the investigation. Defense counsel warned the jury that the government's law enforcement witnesses were suspect "because they are basing it [the investigation] upon their own <u>bias</u>" and upon "the <u>bias</u> of Barron." (Tr. 256 (emphasis added).) Later, during the trial, the defendants accused the case agent, Deputy Nelson, of shooting James Chapman's wife two years before the charged offense:

> Q [Mr. Smith to Deputy Nelson]: And the reason was because two years ago, she was shot --
> Mr. Johnson: Objection. . . .

> The Court: What was that all about?
> Mr. Johnson: Apparently, I'm not certain of this -- Mr. Jontz mentioned this in passing yesterday afternoon. I'm not familiar with this, but apparently there was a warrant that was executed at the home where Geneva Stroud was two years ago where shots were fired and she may have been shot. It has nothing to do with this case. It has nothing to do with this officer. It is entirely irrelevant. It's an inflammatory question. There is no basis for it to be asked. We would like an instruction to the jury to disregard the question that anything that might have happened with Geneva Stroud isn't relevant to this case. And frankly, the government is shocked at the behavior of Mr. Smith. It's absolutely outrageous.
> The Court: What is the relevance?
> Mr. Smith: In reference to his bias against these individuals.

(Tr. 708-710 (emphasis added).) The defendants also accused officers of planting the marijuana evidence, and of planting James Chapman's fingerprints on marijuana bags. (Tr. 452-454, 596-606, 708-711; Sent. (James Chapman) 62-63.)

**C. <u>Agent Scheer Testified Regarding Barron's Statements</u>**

Given the accusations regarding the improper motives of investigators and prosecutors, the United States sought to detail the evolution of the investigation that stemmed from Barron's Colorado arrest. DEA Special Agent Kyle Scheer testified regarding the information provided by Barron:

> Q. Did you get information from the Colorado DEA Task Force regarding a traffic stop that had happened in Colorado?
> A. Yes, I did.
> Q. And did you get information about where that car, where that marijuana was heading?
> A. Yes, I did.
> Q. And based on that information, did you agree with Colorado DEA Task Force to combine investigations?
> A. Yes, I did.

Q. What was the name of the person that was stopped in Colorado?
A. Francisco Barron.
Q. And on May 11, did Mr. Barron arrive in Minnesota?
A. Yes, he did.
Q. Who accompanied him?
A. Task Force officers -- Task Force Officer Perry Powell and Special Agent Bill Eldridge.
Q. And you conducted an interview of Mr. Barron. Is that correct?
A. That's correct.
Q. And Mr. Barron agreed to cooperate in what you call a controlled delivery?
A. Yes.
Q. Now, let's talk a little bit about your interview with Mr. Barron. Did he tell you where he picked up the marijuana.
A. Yes, he did.
Q. Did he tell you where he was going to deliver the marijuana?
A. Yes, he did.
Q. Did he tell you the name of the person to whom he was delivering marijuana?
A. Yes he did.
Q. And did he tell you whether or not this was his first trip --
A. Yes.
Q. -- to sell marijuana in Minnesota?
A. Yes. . . .
Q. Now, how many times before did he tell you that he had come to Minnesota to deliver marijuana?
A. At least twice.
Q. Was there a regular routine in his delivery of marijuana to Minnesota?
A. Yes.
Q. And was the arrangement for this trip the same as the arrangement that he had in his previous trips to Minnesota?
A. Yes.
Q. Where did he say that he got the marijuana from?
A. A party by the name of Arturo in Arizona.
Q. And what was -- if you could just describe the arrangement between Arturo and Barron? Like how did it work.
A. Arturo would contact him and tell him to get a rental car and meet him at a certain location. Barron would get the car, meet him at a location. Arturo would load the vehicle with what he thought

to be approximately 120 to 150 pounds of marijuana. At that time, he would leave. The trip --

Q. You say he would leave, what do you mean?

A. Barron would leave Arizona, start his drive to Minneapolis, which he stated took approximately three days. He would not contact anyone en route to Minnesota. Once he arrived in Minnesota, he would generally get a hotel room in Burnsville. Generally, the Super 8 in Burnsville. Once here, he would contact the person the marijuana was to be delivered to. And then arrangements would be made between them as to how it would be delivered.

Q. And was Mr. Barron to be paid for his participation in this?

A. Yes, he was.

Q. And what was the nature of that compensation?

A. He would get $3,000 plus expenses.

Q. Now, was the person he had met on the previous trips to Minnesota the same one that he was going to meet this time?

A. Yes.

Q. Now, did Barron give you any physical items in that interview?

A. Yes, he did.

(Tr. 301-303.) Neither defendant testified.

On August 9, 2001, the jury returned a guilty verdict on both Counts 1 and 2 with respect to James Chapman and on Count 1 with respect to Craig Chapman. On June 13, 2002, James Chapman was sentenced to thirty-three months of imprisonment on both counts, to be served concurrently.

**D. <u>Eighth Circuit Affirms James Chapman's Convictions</u>**

On appeal, James Chapman challenged Barron's statements to Agent Scheer as inadmissible hearsay, and as violating his rights under the confrontation clause of the Sixth Amendment. The Eighth Circuit agreed with both of these contentions, but held that the error was harmless beyond a reasonable doubt. <u>United States v.</u>

Chapman, 345 F.3d 630, 636 (8th Cir. 2003). The Court carefully considered "whether the guilty verdict actually rendered in this trial was surely unattributable to the error," Sullivan v. Louisiana, 508 U.S. 275, 279 (1993), to conclude that James Chapman's conviction "cannot be attributed to Mr. Barron's statements." Id. First, viewed in the context of the other admitted evidence, "the only possible inference that the jury could have drawn was that the "buyer" Mr. Barron spoke of was [James] Chapman's brother, Craig," not James Chapman. Second, James Chapman's convictions:

> could very easily be attributed entirely to evidence unrelated to Mr. Barron's statements to Agent Scheer. . . . For example, in the recorded telephone conversations between Craig and Mr. Barron, after Mr. Barron inquires whether Craig has the money, Craig says "Ah, I believe so. I'll check with James. . . . If not, we're so close it don't make no difference." When Mr. Barron later asks Craig, "Why don't you come and get this shit?" Craig replies, "Yeah, let me call my bro."
>
> In fact, before Craig drove to Mr. Barron's motel, investigators observed him stop at a house where Mr. Chapman was staying. After leaving the house and before driving to Mr. Barron's motel, Craig was observed placing a box in the trunk of his car, which was later found to contain a substantial amount of cash. At this house, investigators also found Mr. Chapman's W-2 employment tax form and a cellular telephone with the name "James" on the back. In the garage of the house investigators found a cooler containing at least fourteen bags of marijuana and numerous plastic bags with marijuana residue, along with Mr. Chapman's pit bull terrier. Three of Mr. Chapman's fingerprints were recovered from two of the plastic bags.

Id.

On November 21, 2003, the defendant was placed on supervised release. His supervision will conclude on November 20, 2005.

**ARGUMENT**

The defendant again claims the government (and the magistrate judge) violated his rights by illegally releasing Barron and not disclosing his informant record. He further claims his attorneys provided ineffective assistance of counsel.

A prisoner may bring a motion under 28 U.S.C. § 2255 to vacate, set aside, or correct a sentence on the ground the sentence was imposed in violation of the United States Constitution or federal statutory laws. "A § 2255 'petition can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible or conclusions rather than statements of fact.'" Delgado v. United States, 162 F.3d 981, 983 (8th Cir. 1998) (quoting Engelen v. United States, 68 F.3d 238, 240 (8th Cir. 1995)).

A petitioner seeking post-conviction relief bears the burden of establishing the need for an evidentiary hearing. United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993). In order to prevail on a § 2255 motion, petitioner must show that his challenge raises a "fundamental defect which results in a complete miscarriage of justice." Davis v. United States, 417 U.S. 333, 346 (1974).

Section 2255 does not give a prisoner the right to retry his case in which he has been adjudged guilty. Houser v. United States, 508 F.2d 509, 514 (8th Cir. 1974). A section 2255 motion may not be employed to collaterally attack issues that have been raised and decided on direct appeal. United States v. Wiley, 245 F.3d 750, 752 (8th Cir. 2001); Dall v. United States, 957 F.2d 571, 572 (8th Cir. 1992) (per curiam).

The defendant claims the United States magistrate judge illegally procured Barron's release and ultimate flight from justice, and hid Barron's status as a government informant. This Court has previously ruled that the government did not illegally procure Barron's flight, and that there was no evidence Barron was a government informant, even if his status had any relevance to the issues presented at trial. In short, the defendant's allegations are baseless and should be summarily rejected - given the trial record and the absence of any credible proffered facts by the defendant.

Even indulging this flight of fancy, the defendant's conclusory allegations are insufficient to undermine the jury's verdict. By claiming the government hid Barron's status as an informant, the defendant seems to contend the government violated Brady v. Maryland, 373 U.S. 83 (1963). Thus, the defendant must show that the prosecution suppressed evidence, the evidence was favorable to him, and the evidence was material to the issue of

guilt or punishment. Prewitt v. Goekem, 978 F.2d 1073, 1078 (8th Cir. 1992). Presumably, the defendant views Barron's alleged informant status as evidence which would have impeached Barron's hearsay statement to Agent Scheer. Such evidence is material under Brady "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985).

In this case, the Eighth Circuit has already held that there was overwhelming evidence of the defendant's guilt - even if Barron's statements were excised from the trial. It is clear the result of the trial would not have different even if the alleged evidence had been produced to the defense.[2] This claim is without merit.

In conclusory fashion, the defendant further proclaims his attorneys provided ineffective assistance. To show ineffective assistance of counsel, the defendant must show both that counsel's

---

[2] The defendant has not presented or proffered the nature of the new "evidence" showing the prosecution misled the Court about Barron's informant status. To sustain this allegation of newly discovered evidence, he must make the requisite showing that he was sufficiently diligent in searching for this evidence before trial, and that the new evidence "is material, more than merely cumulative or impeaching, and likely to produce an acquittal if a new trial is granted." United States v. Dogskin, 265 F.3d 682, 685 (8th Cir. 2001). As already discussed, Barron's alleged status as an informant is pertinent only as impeaching evidence - which disqualifies the evidence from being sufficient to undermine the jury's verdict.

performance fell below an objectively reasonable standard, and that the defective performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687-88, 104 (1984); White v. Luebbers, 307 F.3d 722, 727-28 (8th Cir. 2002). The defendant fails to assert any facts at all to provide a foundation for his ineffective claim. Thus, the claim should be dismissed.

The defendant has utterly failed to meet his burden to establish the need for an evidentiary hearing. Based on the record before the Court, the petition should be denied.

Respectfully submitted,

THOMAS B. HEFFELFINGER
United States Attorney

Dated: June 6, 2005

Michelle E. Jones

FOR: LISA A. BIERSAY
Assistant U.S. Attorney
Attorney ID No. 028452X